[No. 21275-7-II.   Division Two.   April 17, 1998.]

FRANK MAXWELL, *Appellant*, v. THE DEPARTMENT OF CORRECTIONS, *Respondent*.

172

*Paul D. Doumit* of *Doumit & Doumit, P.C.*, for appellant. *Christine O. Gregoire, Attorney General*, and *Kelly S. Reese, Assistant*, for respondent.

HUNT, J. — Frank Maxwell appeals a Thurston County

Superior Court order affirming the Personnel Appeals Board's (PAB) termination of his position as a cook with the Department of Corrections (DOC). Maxwell argues that the bizarre behavior which led to his termination was caused by his medical conditions: diabetes and manic depression. He argues the PAB erred by finding (1) that his acts were willful, and (2) that the DOC did not discriminate against him when it terminated him rather than accommodating his medical conditions. We affirm.

## FACTS

Maxwell worked as a cook at the Department of Corrections, Washington State Corrections Center, from May of 1984 until November of 1993. The DOC terminated Maxwell, effective November 19, 1993, based on (1) willful violation of a personnel rule, and (2) insubordination, gross misconduct, and neglect of duty.

The charges were based on Maxwell's behavior at his workplace on August 5 and 6, 1993. On August 5, Maxwell reported to work, but appeared unstable and disoriented. His behavior was described as impaired and aggressive. Other employees observed him: deliberately walking shoulder-first into a gate; dropping food on his face and shirt without noticing or attempting to clean it up; yelling, "I need my hit"; and attempting to provoke a physical fight with another officer. He also used profanity towards other employees and refused to return to his workstation after being so ordered. He was then sent home, but he made several disruptive phone calls to the facility from his home. On August 6, Maxwell returned to work and initially appeared capable of working. But later in the day, Maxwell confronted and verbally provoked an inmate, causing the inmate to become angry. Officers had to escort the inmate from the area to prevent further escalation of the conflict.

The DOC held a hearing to determine appropriate discipline for Maxwell. Maxwell conceded that he had committed the above acts. But he argued either that his diabetes

and elevated glucose levels, or the side effects of medication prescribed for his diagnosed manic depression, had caused his behavior. The DOC was aware of Maxwell's medical conditions but was not informed that Maxwell was taking medication with negative behavioral side effects. Under DOC rules, each employee is expected to notify his or her supervisor if taking medication that may or does cause side effects. *See* Washington Corrections Center Field Instruction WCC 870.005 (1992). Accordingly, DOC cited Maxwell's willful violation of this rule as one of the grounds for termination. The DOC also found that Maxwell violated DOC rules requiring each employee to treat other staff with "dignity and respect," to perform duties in a safe manner, and to refrain from coming to work under the influence of drugs or alcohol.

Maxwell appealed to the PAB. He alleged that his termination violated Washington's antidiscrimination statute because DOC failed to accommodate his medical condition.

At the hearing, several doctors testified regarding Maxwell's medical condition. Dr. Tore K. Nielsen testified that aggressive behavior might be caused by Maxwell's antidepressant medication in conjunction with the hot weather. He also testified there was a possibility that Maxwell was bipolar, but he was not certain. Dr. David B. Kelley testified Maxwell's glucose levels were extremely high in June, July, and October, but he did not know Maxwell's glucose levels on August 5 and 6. Although Dr. Kelley testified Maxwell's glucose was likely high in August, he also testified Maxwell's prior glucose tests were performed in the afternoon, thus likely resulting in a higher glucose level. Dr. Kelley further testified that such elevated glucose levels could lead to irritability, discoordination, confusion, and possibly aggressive behavior.

There was also testimony that Maxwell was not properly controlling his diabetes. But both Maxwell and his girl friend, Tammie Reidle, testified that Maxwell had taken his insulin shots on August 5 and 6. Additionally, some evi-

dence indicated that Maxwell had an alcohol and/or substance abuse problem during the months before his termination.[1]

After the hearing, the PAB affirmed DOC's decision, holding: (1) the evidence did not show that Maxwell was suffering from any symptoms of his diabetic condition or side effects of medication on August 5 or 6; and (2) the DOC did not discriminate against Maxwell because he had failed to request accommodation as required by WAC 356-35-010.[2] Maxwell appealed the PAB decision to the Thurston County Superior Court, which affirmed the PAB.

## ANALYSIS

Maxwell was terminated for neglect of duty, gross misconduct, insubordination, and willful violation of policy. The willful violation of policy refers to Maxwell's failure to report to his supervisors that he was taking prescription medication that may have noticeable side effects. The remainder of the reasons relate to Maxwell's actions on August 5 and 6, 1993.

Maxwell does not argue that an employee who acts the way he did should not be terminated. Rather, he argues that he should be excused because his behavior was caused by his medical condition and was therefore not willful. Thus, the issue here is not whether an employee who commits such acts should normally be terminated. Instead, we must address whether the evidence support's the PAB's determination that Maxwell's behavior was not caused by his medical condition, and whether DOC discriminated against Maxwell by terminating him rather than accommodating his disability.

---

[1]Reidle testified Maxwell had an alcohol abuse problem before they started dating, but another cook at DOC testified Reidle told him a few months before Maxwell's termination that she was afraid she would lose her children because Maxwell was using drugs.

[2]WAC 356-35-010(4), regarding disability and reasonable accommodation, reads in part: "determinations of disability shall be made by an appointing authority *only at the employee's written request* or after obtaining a written statement from a physician or licensed mental health professional." (Emphasis added.)

■■ RCW 41.64.130 and .140 govern review of PAB decisions. An appeal may be based on one or more of the following deficiencies in the PAB order: (1) "[f]ounded on or contain[ing] an error of law"; (2) "[c]ontrary to a preponderance of the evidence"; (3) "[m]aterially affected by unlawful procedure"; (4) "[b]ased on violation of any constitutional provision"; or (5) "[a]rbitrary or capricious." RCW 41.64.130. When the issue is a question of fact, the reviewing court

> must accord the administrative decision a presumption of correctness . . . . The test, referred to as the substantial evidence test, is whether there exists therein any competent, relevant and substantive evidence which, if accepted as true, would, within the bounds of reason, directly or circumstantially support the challenged finding or findings.

*Ballinger v. Department of Soc. & Health Servs.*, 104 Wn.2d 323, 328, 705 P.2d 249 (1985) (citing *Gogerty v. Department of Insts.*, 71 Wn.2d 1, 8-9, 426 P.2d 476 (1967)).

### A. Willful Acts

#### 1. Failure to Notify Supervisor of Prescription Medication

■ DOC policy requires every employee to notify his or her supervisor when taking medication that may have side effects. The PAB found that Maxwell's failure to notify his superiors at DOC about his antidepressant medication was a willful failure to follow a personnel rule. Maxwell argues he did not know the medication might have side effects, so his failure to inform was not willful. But Maxwell knew he was taking medication for his depression, and he testified that the doctor told him there might be side effects. An employee should not be allowed to claim ignorance in order to avoid the consequences of the side effects, especially when the effects are easily discoverable. The PAB did not err when it found sufficient evidence to support this charge.

## 2. Acts of August 5 and 6

Maxwell argues that the charges of neglect of duty, gross misconduct, and insubordination require intent on the part of the employee. He asserts that because he was suffering from the effects of his medical condition, his acts could not have been willful. He cites no case, WAC, or personnel policy requiring the DOC specifically to prove intent as an element of employee misconduct, insubordination, or neglect of duty.

Maxwell concedes he did the acts charged by the DOC. The PAB found the evidence did not support a finding that Maxwell was suffering from effects of diabetes or side effects of medication on August 5 or 6. The PAB stated:

> The testimony provided relating to the condition of diabetes was informative; however, it provided no factual information as to [Maxwell's] actual condition on August 5 and 6, 1993. No conclusive evidence was presented that supports [Maxwell's] assertions that his actions were the result solely of his diabetes and/or the anti-depressant medication.

The PAB's finding is accorded a "presumption of correctness," and it is supported by the record. *Ballinger*, 104 Wn.2d at 328.

Although Dr. Kelley testified that Maxwell's glucose levels were abnormally high in June, July, and October 1993, there was no evidence that his levels were high on August 5 or 6. Both Maxwell and his girl friend testified that he took his insulin shots on both of those days. And, as noted above, there was also some evidence that Maxwell may have been having alcohol or drug problems during that time. Accordingly, there is sufficient evidence to sustain the PAB's finding that Maxwell was not suffering effects of diabetes or antidepressant medications.

■ Maxwell has the burden of proving his defense. Because he did not prove he was suffering from effects of his medical conditions, we uphold the PAB's determination on this issue.

## B. Handicap Discrimination—Failure to Accommodate

Washington's Law Against Discrimination provides that

it is an unfair practice for any employer "[t]o discharge or bar any person from employment because of age, sex, marital status, race, creed, color, national origin, or the presence of any sensory, mental, or physical disability . . . ." RCW 49.60.180(2). Failure to reasonably accommodate a "handicapped" employee constitutes discrimination under the Act. *See Dean v. Municipality of Metro. Seattle*, 104 Wn.2d 627, 632, 708 P.2d 393 (1985). But the record does not support Maxwell's claim that the DOC discriminated against him by failing to accommodate his disability; he did not show he is "handicapped" under the statute and therefore cannot show the DOC had a duty to accommodate.

1. "Handicapped"

■ A person is "considered to be *handicapped* by a sensory, mental, or physical condition if he or she is *discriminated against because of the condition* and the condition is abnormal." WAC 162-22-040(1)(a); *see also Phillips v. City of Seattle*, 111 Wn.2d 903, 906, 766 P.2d 1099 (1989). "One is not 'handicapped' for purposes of enforcing an unfair practice claim unless both elements are satisfied." *Doe v. Boeing Co.*, 121 Wn.2d 8, 16, 846 P.2d 531 (1993). The existence of each element is a question of fact. *Id.* at 15. Whether an employee was discriminated against because of an abnormal condition "depends upon the documentation of the employer, testimony regarding the dismissal, and other relevant facts." *Phillips*, 111 Wn.2d at 909.

■ In order to show DOC fired him because of his condition, or because of behaviors caused by his condition, Maxwell must first show that the condition actually caused him to behave abnormally. As discussed above, the Board determined the evidence did not show that Maxwell's behavior was actually caused by either alleged abnormal condition. Without evidence that Maxwell's abnormal condition caused his behavior, he cannot show that the DOC terminated him because of his condition or discriminated against him because of his condition.

Additionally, there was no evidence in the record that DOC had discriminated against or harassed Maxwell in the past because of his conditions. Conversely, although Maxwell had been disciplined in the past for similar behavioral problems, in 1992 he was temporarily promoted to food manager and had received satisfactory evaluations. In *Doe*:

> Boeing argues that Doe's condition of gender dysphoria is not a "handicap" under the Act because there is no evidence of discrimination. We agree. The record substantially supports the trial court's findings that Boeing did not discriminate against Doe because of her condition. Boeing discharged Doe because she violated Boeing's directives on acceptable attire, not because she was gender dysphoric. Doe was treated in a respectful way by both her peers and supervisors at Boeing. Doe's supervisor consistently rated her work as satisfactory on her performance evaluations. While complaints were filed with Boeing management about Doe's use of the women's rest room, the record is void of any evidence that Doe suffered harassment because of her use of the rest room or because of her attire.

*Doe*, 121 Wn.2d at 17-18. Similarly, Maxwell has not shown that he suffered discrimination because of his condition, and has not shown he is "handicapped" under the statute.

2. Duty to Accommodate

■■ DOC was aware that Maxwell suffered from diabetes. He argues that DOC discriminated against him because it failed to investigate fully the possible side effects of his condition.

> The duty of an employer reasonably to accommodate an employee's handicap does not arise until the employer is "aware of [the employee's] disability and physical limitations." . . . [T]his triggers the employer's burden to take "positive steps" to accommodate the employee's limitations.

*Goodman v. Boeing Co.*, 127 Wn.2d 401, 408, 899 P.2d 1265 (1995) (quoting *Holland v. Boeing Co.*, 90 Wn.2d 384, 388-89, 391, 583 P.2d 621 (1978)) (additional citations omitted).

But no duty arises unless there is a need for accommodation. For example, in *Doe,* the court stated:

> Doe contends that Boeing's dress code failed to accommodate her condition and, thus, was discriminatory. We disagree. The record substantially supports the trial court's findings that Boeing reasonably accommodated Doe in the matter of dress by allowing her to wear unisex clothing at work. Despite this accommodation, Doe determined unilaterally, *and without medical confirmation,* that she needed to dress as a woman at her place of employment in order to qualify for sex reassignment surgery. *We find substantial support for the trial court's finding that Doe had no medical need to dress as a woman at work* in order to qualify for her surgery.

*Doe,* 121 Wn.2d at 18-19 (citation omitted) (emphasis added). Because there was no evidence Doe required accommodation, the trial court determined Boeing did not discriminate by failing to accommodate. Similarly, here the Board determined there was insufficient evidence to show Maxwell's medical needs caused his behavior and thus required accommodation. As discussed above, the record supports this finding.

Additionally, Maxwell never notified DOC about his possible need for accommodation or that he was taking prescription medication which might affect his behavior or require special treatment. "The employee, of course, retains a duty to cooperate with the employer's efforts by explaining her disability and qualifications." *Goodman,* 127 Wn.2d at 408 (citing *Dean,* 104 Wn.2d at 637-38). "Reasonable accommodation thus envisions an exchange between employer and employee where each seeks and shares information to achieve the best match between the employee's capabilities and available positions." *Id.* at 408-09.

Accordingly, Maxwell has not shown that DOC discriminated against him by failing to accommodate his condition. We affirm the Board on this issue as well.

## CONCLUSION

Affirmed.

HOUGHTON, C.J., and BRIDGEWATER, J., concur.

Review denied at 136 Wn.2d 1022 (1998).